**Robert DAVIS, Plaintiff,**

v.

**John Douglas ORT, individually and in his official capacity as a police officer with the Mansfield Twp. Police Department, Defendant.**

No. Civ.A.97–5824(GEB).

United States District Court,
D. New Jersey.

Jan. 6, 1999.

John E. Ursin, Salny, Redboard & Rinaldi, Succasunna, NJ, for plaintiff.

Richard P. Cushing, Gebhardt & Keifer, Clinton, NJ, for defendant.

## MEMORANDUM OPINION

HUGHES, United States Magistrate Judge.

This matter comes before the Court on Defendant's motion for summary judgment. Plaintiff submitted opposition to the motion, and Defendant submitted a reply brief to Plaintiff's opposition. The Court heard oral argument on December 21, 1998. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C.A. § 636 and FED.R.CIV.P. 73, for all purposes, including trial. For the reasons stated in this Memorandum Opinion, Defendant's motion is granted.

## I. INTRODUCTION

### A. *Factual Background*

The facts in this case are largely undisputed. (*See* Plaintiff's Brief at 1). On November 26, 1995, Patrolmen Arthur Adams, Jr. and John Douglas Ort, officers with the Mansfield Township Police Department, observed a 1994 Chevrolet, driven by Janet Symanski, proceeding through a red light. (*See* Defendants' Statement of Material Facts ("Def.Facts") at ¶ 2; Defendants' Exhibit ("Def.Ex.") B, Report of Officer Arthur Adams, Jr., November 29, 1995). Officers Adams and Ort pulled the Chevrolet over and approached Ms. Symanski, who exited the vehicle. (Def. Facts at ¶ 2). She informed the officers that she had had a dispute with her boyfriend, who had broken the driver side rear window of her car. (*Id.*) The officers escorted Ms. Symanski to her residence. (*Id.*) At the residence, Ms. Symanski described her boyfriend's car to the officers. (*Id.* at ¶ 3).

As Officer Adams exited the residence and approached his patrol car, he observed a vehicle, matching the description provided by Ms. Symanski of her boyfriend's car, entering the parking lot. (*Id.*) Officer Adams approached the driver's door, opened it, and detected the odor of alcohol. (*Id.* at ¶ 4). As the driver, Plaintiff Robert Davis, exited the vehicle, Officer Adams noticed that Davis "took a studder step to gain his balance." (*Id.*) Officer Adams saw that Davis's eyes were glassy and bloodshot, he was slurring his speech, and his breath smelled of alcohol. (*Id.*) When asked how much he had to drink, Davis admitted having two to three drinks. (*Id.*) Davis informed Officer Adams that he had an argument with his girlfriend but that it was no big deal. (Def.Ex.B).

By radio, Officer Adams then contacted Officer Ort, who was inside the residence. (*Id.*) Officer Ort exited the residence and approached Davis. Officer Ort then administered several sobriety tests. (*Id.*) After Davis failed the sobriety tests, Officer Ort advised Davis that he was under arrest for driving while intoxicated. (*Id.*) Davis was handcuffed and placed in the rear of the patrol car. (*Id.*) He then began yelling for his girlfriend and kicking the driver's side rear window. (*Id.*) Davis broke the driver's side rear window and pushed the door out. (*Id.*) The Officers

restrained Davis. (*Id.*) He stopped kicking the door but continued yelling. (*Id.*)

While at the police headquarters, Davis refused a Breathalyzer. (Def.Ex. C, Mansfield Twp. Police Dept. Investigative Report). Davis then "began to get abusive" with Sergeant Patricia Mannon and Officer Ort. (Def.Ex. D, Mansfield Twp. Police Dept. Supplemental Report). Wearing handcuffs, Davis picked up a plant and threw it at Sergeant Mannon. (*Id.*) Davis refused to be fingerprinted. (*Id.*)

On April 28, 1998, Davis was deposed in connection with this matter. (Def.Ex. Q, Deposition of Robert Davis). Davis' testimony was consistent with the police report, except as it related to the alleged assault and an event that transpired at the police station. Davis testified that after Officer Ort escorted him into the police car, Davis began yelling at Officer Ort, "What the hell are you doing this for? What are you doing this for?" (*Id.* at 37). After Davis entered the back of the police car, Davis stated that Officer Ort "jumped on top of me, started choking me, strangled me, pulling me, twisting me." (*Id.*) Davis further stated, "Then the other police officer came over and said, 'Hey man, what are you doing to him?' Ort said, 'Don't worry about it.' " (*Id.* at 39). Davis testified that Officer Ort "was in [the car] three or four times doing this to me." (*Id.* at 52). It was only after the third alleged assault, of the series of three or four alleged assaults, that Davis kicked out the driver's side rear window. (*Id.*) Davis explained that he kicked out the window of the police car attempting to get the neighbors' attention. (*Id.* at 54). Through the course of the series of alleged assaults, Davis stated that he was angry and yelling for his girlfriend, Ms. Symanski, to get help. (*Id.* at 52). Davis further stated that as Officer Ort was grabbing, twisting and choking Davis, Officer Ort temporarily cut off Davis' airflow. (*Id.* at 54).

Davis explained that at the police station, he refused to cooperate with the police officers because Officer Ort had assaulted him: "I said, 'I won't do anything [for you] after what you did to me.' " (*Id.* at 63). He further stated that, while at the police station, he threw a plant at the ground—not at a police officer. (*Id.*)

Later in the evening of November 26, 1995, Davis was taken to the Hacketstown Community Hospital due to his complaints of pain. (Def. Facts at ¶ 10). The hospital records indicate "no bruises, no abrasion, spine negative, no evidence of contusion, kidney not tender." (Def.Ex. M., Hacketstown Community Hospital, Emergency Dept. Records) A nurse's assessment indicated abrasions and scratches on Plaintiff's right neck. (*Id.*) An X-ray of Plaintiff's cervical spine indicated neither a fracture nor a dislocation. (*Id.*) The examination further indicated no fracture of the nasal bone and no fracture or dislocation of the right shoulder. (*Id.*)

Davis' Complaint alleges that, as a result of the incident, Davis was injured, "both physically and emotionally." (Compl. at ¶ 2). The Complaint further alleges that Davis suffered "severe injuries, including injuries to his nose, neck, shoulders, and back"; that he was "forced to endure great pain and mental suffering"; that he "has incurred, and will continue to incur medical expenses, including the costs of surgery and future surgery"; and that he "has been prevented from engaging in his normal employment." (Compl. at ¶ 17).

On November 27, 1995, Davis was released on $15,000 bail. (Def.Ex.P).

The damage to the police vehicle was estimated at $448.80 (Def.Ex.O.)

The following charges were filed against Davis:

a) a summons for driving while intoxicated in violation of N.J.S.A. 39:4–50;

b) a summons for refusal to take a chemical test in violation of N.J.S.A. 39:4–50.4a;

c) a summons for having an unsigned license in violation of N.J.S.A. 39:3–9a

d) a charge of criminal mischief for damaging a police vehicle in violation of N.J.S.A. 2C:17–3a(1)

e) a charge of preventing an officer from effecting a lawful arrest by means creating a risk of physical injury in violation of N.J.S.A. 2C:29–2a, with a penalty as a fourth degree crime;

f) a charge of preventing an official function (fingerprinting and photographing in violation of N.J.S.A. 2C:29–1;

g) a charge of creating a dangerous condition in violation of N.J.S.A. 2C:33–2a(2).

(Def. Facts at ¶ 13). Defendant asserts that the "total maximum penalties for all these charges would be a fine of $11,020; two years and seven months in jail; and loss of driver's license for one year." (*Id.* at ¶ 14).

Counsel for Davis submitted a letter, dated January 19, 1996, to the Mansfield Township Police Department on Plaintiff's behalf essentially offering a plea agreement. (Def.Ex. I, letter of Bradford Day, January 19, 1996). The letter indicated that Davis would forego his right to pursue civil remedies against the police department and the municipality and any claims for medical damages and or other damages provided that the motor vehicle summonses be dismissed. (*Id.*) The letter further states that Davis had "already consulted with a Morris County attorney who specializes in civil suits of this nature." (*Id.*)

The Warren County Prosecutor referred the charges to Municipal Court, dismissing the charge for preventing a lawful arrest under N.J.S.A. 2C:29–2a, and downgrading the charge for preventing an official function under N.J.S.A. 2C:29–1 to refusing to submit to identification procedures under N.J.S.A. 53:1–15. (Def.Ex. J, letter of the Warren County Prosecutor, April 1, 1996). The charges for disorderly persons penalties of $1000 and six months were left unchanged. (*Id.*) The downgraded charges left Plaintiff with a maximum exposure to $3,520 in fines, 13 months jail time, and loss of driver's license for one year. (Def. Facts at ¶ 17).

Davis appeared in Municipal Court on May 20, 1996 with counsel. The record indicates that Davis (a) retracted his not guilty plea entering a plea of guilty for driving while intoxicated and creating a disturbance; (b) agreed to make restitution in the amount of $448 to the Township for damaging the patrol car; and (c) agreed to execute a release "to the Township of Mansfield and all related parties, indicating that there would be no civil liability to him [Davis] in any way." (*See* Def.Ex. K, at 3–8, Municipal Court Transcript, May 20, 1996)). In exchange for Davis' plea, the Municipal Prosecutor (a) agreed to move to merge the remaining charges; (b) indicated that he did not object to mandatory minimum penalties, which would involve a $250 fine; and (c) stated that he would request a 90–day attendance in an Alcohol Anonymous program with no less than a five day suspended jail term. (*Id.*) The Municipal Court Judge then imposed "the minimum penalty, $505, six month license revocation, twelve hours in the IDRC .... even though when there is an assault on property or disobeying officers, generally a jail sentence is imposed." (*Id.* at 7). The Judge further required Plaintiff to make restitution to the Township in the amount of $448.40. (*Id.* at 7–8).

In Davis' deposition, he indicated that during his Municipal Court hearing on May 20, 1996, he accepted the plea agreement because "it was either that or jail.... I didn't agree with it but I had no choice, either that or taking me to jail right there." (Def.Ex. Q at 80). Davis stated that, during the plea negotiations, his attorney told him "They want drunk driving or you go to jail right now six months." (*Id.*) Davis testified that he intended to appeal a plea agreement waiving his right to pursue a civil action even before the May 20, 1996 Municipal Court

hearing: "I decided before going in, I wasn't going to deal with it [the plea agreement]. I said I'll appeal this because if I didn't do what they told me to do, I was going to jail for six months." (*Id.* at 80).

On November 4, 1996, Davis appeared in Municipal Court pro se, moving to withdraw his guilty plea. (Def.Ex. L at 3–4). Plaintiff described the May 20, 1996 Municipal Court hearing in the following terms:

> I was coerced through the whole thing. I stood out there for three hours while they—90 days in jail, six months in jail—I didn't do anything wrong. I wasn't driving the car. New Jersey states you have to be in a car, keys in the ignition. I was on my sidewalk.

(*Id.* at 4). The Municipal Court Judge stated, "I'll deny the motion. There was a factual basis on the record. You were represented by counsel and you pled guilty." (*Id.*)

### B. *The Civil Action*

On November 25, 1997, Davis (hereinafter "Plaintiff") initiated this civil action alleging a violation of his civil rights. Plaintiff named Chief of Police of the Township of Mansfield, Louis Esposito, the Township of Mansfield and John Does, 1–10 as Defendants. However, on November 23, 1998, the Court dismissed all state claims against all Defendants and federal claims against Chief Esposito and the Township of Mansfield. The Court further directed that the sole issue for trial is whether Officer Ort used excessive force against Plaintiff.

Defendant, Officer Ort, filed the present motion for summary judgment on December 9, 1998. Defendant argues that the plea agreement to release the municipality and officers from liability is enforceable and serves as a bar to Davis' claims. Defendant's argument is based on two principal contentions. First, the agreement was voluntary, deliberate and informed. Second, the agreement was not adverse to the public interest. Therefore, Defendant contends that Davis waived his right to pursue a civil action and that no genuine issues of material fact exist that would preclude the Court from granting summary judgment in its favor.

Plaintiff argues that summary judgment should not be granted for the following reasons. First, Defendant failed to meet its burden of proving that, on balance, the public interest favors enforcement of the agreement. Second, Plaintiff argues that the oral release-dismissal agreement is unenforceable as a matter of law. Third, alternatively, genuine issues of material fact exist relating to the voluntariness of the release dismissal agreement and the public interest served.

## II. *DISCUSSION*

### A. *Summary Judgment*

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R.CIV.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a summary judgment motion, the non-moving party receives the benefit of all reasonable doubts and any inferences drawn from the underlying facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the non-moving party bears the burden of proof at trial as to a dispositive issue, Rule 56(e) requires him to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Issues of material fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. *Enforceability of the Release–Dismissal Agreement*

The principal question before the Court is whether a release agreement is enforceable when a defendant in a municipal court proceeding waives his right to pursue a civil rights action in exchange for pleading guilty to less serious municipal charges. Agreements, in which a criminal defendant waives potential civil claims in exchange for the dismissal of the criminal case against him, are called "release-dismissal agreements." *Livingstone v. North Belle Vernon Borough,* 91 F.3d 515, 519 (3d Cir.1996) ("*Livingstone II* "). The present case concerns a municipal court proceeding, which is quasi-criminal—as opposed to a typical criminal proceeding. Moreover, Plaintiff's municipal charges were reduced rather than being dismissed. Nevertheless, considering the similarities between release-dismissal agreements and the agreement in question—in terms of legal issues raised and the public interests at stake—the Court finds that case law concerning release-dismissal agreements applies to this case. The Court will treat Plaintiff's agreement, and refer to it, as a release-dismissal agreement.

In *Town of Newton v. Rumery,* the United States Supreme Court addressed "whether a court properly may enforce an agreement in which a criminal defendant releases his right to file an action under 42 U.S.C. § 1983 in return for a prosecutor's dismissal of pending criminal charges." 480 U.S. 386, 389, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). In *Rumery,* Bernard Rumery, was charged with tampering with a witness who was pressing charges against a friend of his. 480 U.S. at 390, 107 S.Ct. 1187. Rumery's attorney negotiated an agreement with the prosecutor whereby the prosecutor would dismiss the witness tampering charges if Rumery would agree to release any claims he might have against the town, its officials or the victim of the alleged witness tampering, for any harm caused by the arrest. *See Id.* Rumery discussed the agreement with

his attorney for about an hour, and his attorney explained to Rumery that by signing the release-dismissal agreement, Rumery would forgo his right to pursue a civil action. *Id.* at 390–91, 107 S.Ct. 1187. Three days later, Rumery went to his attorney's office and signed the agreement. *Id.* at 391, 107 S.Ct. 1187. The criminal charges were dropped. *Id.* Ten months later, Rumery filed an action under § 1983 in the District of New Hampshire alleging that the town of Newton and its officers had violated his civil rights by arresting him, defaming him, and imprisoning him falsely. *See Id.*

The Court, noting that the case raised a question of federal law, resolved the question "by reference to traditional common law principles." *Id.* at 392, 107 S.Ct. 1187. In a four-Justice plurality opinion, the Court established that "a promise is unenforceable if *the interest in [the agreement's] enforcement* is outweighed in the circumstances by *a public policy harmed by enforcement of the agreement.*" *Id.,* (emphasis added). In a concurring opinion, Justice O'Connor, whose fifth vote was dispositive, noted that it is the burden of the defendants to demonstrate that "a particular release executed in exchange for the dismissal of criminal charges was voluntarily made, not the product of prosecutorial overreaching, and in the public interest." *Livingstone II,* 91 F.3d at 527 (quoting *Rumery,* 480 U.S. at 401, 107 S.Ct. 1187). The Court held that the release-dismissal agreement was enforceable and that the possibility of coercion in making such agreements was insufficient by itself to justify a *per se* rule against release-dismissal agreements. *Rumery,* 480 U.S. at 394, 107 S.Ct. 1187.

The Third Circuit Court of Appeals explained the interests to be considered by holding:

> The central tension the *Rumery* Court harmonized was between the need, on the one hand, to curb the temptation to "trump up charges in reaction to a defendant's civil rights claim, suppress evi-

dence of police misconduct, and leave unremedied deprivations of constitutional rights," while on the other hand, to enforce one's "considered decision that he would benefit personally from the agreement" giving up his individual right to sue.

*Cain v. Darby Borough,* 7 F.3d 377, 380 (3d Cir.1993) (en banc), *cert. denied,* 510 U.S. 1195, 114 S.Ct. 1303, 127 L.Ed.2d 655 (1994) (quoting *Rumery,* 480 U.S. at 394–95, 107 S.Ct. 1187). The *Rumery* Court resolved this tension holding that release-dismissal agreements must be executed voluntarily, free from prosecutorial misconduct and not offensive to the relative public interest. 480 U.S. at 398, 107 S.Ct. 1187.

In *Cain* and then in *Livingstone II,* the Third Circuit clarified Justice O'Connor's concurring opinion indicating that the "prosecutorial overreaching" and "public interest" questions are not to be analyzed separately. *Livingstone II,* 91 F.3d at 527; *Cain,* 7 F.3d at 380. Rather, "the concept of prosecutorial misconduct is embedded in a larger inquiry into whether enforcing the release would advance the public interest." *Livingstone II,* 91 F.3d at 527 (quoting *Cain,* 7 F.3d at 380). The *Livingstone II* Court, explaining the *Cain* opinion, established that a party seeking to enforce a release dismissal agreement must make two distinct showings. 91 F.3d at 527 (citing *Cain,* 7 F.3d at 381). First, an "objective" element requires both that "the facts known to the prosecutor when the agreement was reached must have sufficed to support the prosecutor's proffered public interest reason for concluding the agreement, and that this public interest reason be a legitimate one." *Id.,* (internal quotes omitted) (citing *Cain,* 7 F.3d at 381). Second, a "subjective element" requires that the public interest reason "proffered by" the prosecutor is "the prosecutor's actual reason for seeking the release." *Id.,* (citing *Cain,* 7 F.3d at 381). The purpose of the subjective element is to prevent a prosecutor from entering a re-

lease-dismissal agreement for an improper motive, e.g. protecting public officials from a meritorious civil rights suit, which a court may later excuse because the agreement achieves an incidental benefit. *Id.*

In *Cain,* the police arrested Diane Cain charging her with several offenses related to her disorderly and assaultive behavior. 7 F.3d at 379. At the time, the Delaware County District Attorney's office offered a program known as the Accelerated Rehabilitative Disposition ("ARD"). *Id.* Under the ARD, a defendant could be placed on probation without trial, and if a defendant satisfactorily completed the program, his or her charges would be dismissed. *Id.* Under the district attorney's policy, a petitioner was not allowed to participate in the ARD program if the police department faced potential civil liability. *Id.* In order to enter the ARD program, Cain executed a release-dismissal agreement. *Id.* She later filed civil rights claims against various defendants alleging that the police used excessive force to arrest her. *Id.* The District Court granted summary judgment in favor of the defendants on the basis of the release-dismissal agreement. *Id.* The Third Circuit reversed, and upon defendants' petition, the court decided to rehear the case *en banc. Id.*

The Third Circuit held that the release-dismissal agreement was unenforceable as a matter of law. *Id.* The *Cain* court found that the because the release-dismissal agreement, requiring the defendant to release her right to pursue civil rights claims, was a prerequisite to entering the ARD program, the agreement was unenforceable because the district attorney's "blanket policy is wholly and patently unrelated to the goals of the ARD." *Id.* at 383. The court found that the policy was both-under and over-inclusive because it allowed unqualified criminal defendants to be admitted to the ARD if they signed releases and excluded otherwise qualified defendants because they refused to sign. *Id.*

In *Livingstone II*, the plaintiffs commenced a civil rights suit alleging, inter alia, § 1983 violations against various municipalities and police officers. *Livingstone II*, 91 F.3d at 519. After remand, the defendants moved for summary judgment asserting that the plaintiffs had waived any civil claims in a release-dismissal agreement. *Id.* The Third Circuit reversed the district court's decision and remanded because material issues of fact as to whether the prosecutor considered the plaintiffs' civil rights claims to be marginal or frivolous precluded the court from granting summary judgment. *Id.* at 530. The court further held that the defendant's had to prove the voluntariness of the release-dismissal agreement with clear and convincing evidence. *Id.* at 534.

■ Plaintiff argues that release-dismissal agreements are *per se* unenforceable when the criminal defendant's charges are prosecuted in municipal court. The Court must reject Plaintiff's contention as having no basis in law. In *Rumery*, the Supreme Court specifically declined to adopt a *per se* rule of invalidity for release-dismissal agreements because the possibility of harm to interests of a criminal defendant fails to credit relevant public interests fostered by such agreements. 480 U.S. at 395, 107 S.Ct. 1187.

### 1. *Voluntariness*

■ With respect to voluntariness, the burden is on the defendant to establish the voluntariness of the release-dismissal agreement by a showing of clear and convincing evidence. *Livingstone II*, 91 F.3d at 534. Referring to *Livingstone v. North Belle Vernon Borough*, 12 F.3d 1205 (3d Cir.1993) (*en banc*) ("*Livingstone I*"), the *Livingstone II* court noted that "oral release-dismissal agreements should be subjected to particularly exacting judicial scrutiny." 91 F.3d at 534.

In *Livingstone I*, the court held that:
While we do not hold that as a matter of law an oral agreement to waive the right to sue in exchange for the dismissal of

criminal charges can never be valid, the absence of a written release-dismissal agreement requires even more scrupulous review by the courts than otherwise. No published opinion if any of the courts of appeals after *Rumery* has even considered, much less sustained, an oral release-dismissal agreement.

*Livingstone I*, 12 F.3d at 1212. The *Livingstone II* court noted a number of advantages of written agreements including: (1) they allowing parties more opportunity for deliberative reflection; (2) facilitating negotiation as to the agreement's terms; (3) providing a subsequent court with evidence as to the parties' respective bargaining power. 91 F.3d at 534.

In *Rumery*, The Court reasoned as follows:
In many cases, a defendant's choice to enter into a release-dismissal agreement will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action. Rumery's voluntary decision to enter this agreement exemplifies such a judgment. Rumery is a sophisticated businessman. He was not in jail and was represented by an experienced criminal lawyer, who drafted the agreement. Rumery considered the agreement for three days before signing it. The benefits of the agreement to Rumery are obvious: he gained immunity from criminal prosecution in consideration of abandoning a civil suit that he may well have lost.

Because Rumery voluntarily waived his right to sue under § 1983, the public interest opposing involuntary waiver of constitutional rights is no reason to hold this agreement invalid. *Rumery*, 480 U.S. at 394, 107 S.Ct. 1187.

In the present case, Defendant contends that Plaintiff entered the agreement voluntarily for several reasons. First, Plaintiff was not incarcerated when he entered the agreement; he had been released on bail. Second, a release-dismissal agreement was

initially proposed by Plaintiff's attorney in writing on January 19, 1996, giving Plaintiff an opportunity to consider the risks and benefits of the agreement long before his municipal court hearing on May 20, 1996. Plaintiff concedes that he was aware of his attorney's January 19, 1996 letter. (Def.Ex Q at 79). Moreover, the municipal court transcript, dated May 20, 1996, amply demonstrates that Plaintiff understood the release-dismissal agreement before he agreed to its terms. Third, Plaintiff conceded that he intended to renege on the agreement even before he agreed to its terms on the record in court. Plaintiff's intent further establishes that he understood the agreement and executed it voluntarily, albeit in bad faith.

Plaintiff argues that issues of material fact concerning whether he was coerced into executing the release-dismissal agreement preclude the Court from granting summary judgment. Without a written agreement, Plaintiff argues that he had neither an opportunity for deliberative reflection nor an opportunity to negotiate the terms of the a written proposal. Plaintiff testified that at the time of the Municipal Court proceeding, he felt that he had no choice: he could either go along with the plea or go to jail immediately after the proceedings.

█ The burden is on Defendant to establish the voluntariness of the release-dismissal agreement by a showing of clear and convincing evidence. *Livingstone II,* 91 F.3d at 534. Since the release-dismissal agreement was oral, but on the record in an official court proceeding, the Court is arguably compelled to subject the agreement to particularly exacting judicial scrutiny, a standard more stringent than the clear and convincing evidence standard. See *Id.* Applying the heightened standard of proof, the Court finds that Defendant has met its burden of proving that the agreement was entered voluntarily. Initially, the Court notes that Plaintiff's attorney proposed a release-dismissal agreement in a letter addressed to the Mansfield Township Police Department

four months before Plaintiff's municipal court date, and Plaintiff was aware of the letter. On May 20, 1996, the prosecutor and Plaintiff's attorney negotiated the terms of the agreement before Plaintiff was brought before the judge. Counsel for Plaintiff consulted with Davis during these negotiations, and Plaintiff informed his counsel that he would execute the agreement. Additionally, the terms of the agreement were explained thoroughly in municipal court on the record. Finally, Plaintiff agreed to the agreement on the record. Thus, the agreement was the result of an arm's length negotiation, and it reflected the certitude of a written agreement when Plaintiff agreed to the its terms on the record. Therefore, the Court finds that Plaintiff entered the release-dismissal agreement voluntarily.

### 2. The Public Interest in Enforcement

Although the *Rumery* Court did not address the appropriate burden of proof in cases where a party seeks to enforce a release-dismissal agreement, the Third Circuit has held that the party seeking to enforce the agreement must show that upon balance the public interest favors enforcement. *Livingstone II,* 91 F.3d at 527; *Cain,* 7 F.3d at 381. In *Rumery,* Justice Powell, writing for a plurality of four, identified public interests that could justify a release-dismissal agreement: "the interest in protecting officials from the burden of defending 'marginal' or 'frivolous' section 1983 claims and the interest in expeditiously resolving minor criminal charges while allocating the scarce resources of the criminal justice system to the prosecution of more serious charges." *Cain,* 7 F.3d at 378 (citing *Rumery,* 480 U.S. 386, 395–96, 107 S.Ct. 1187, 94 L.Ed.2d 405). The Court also cited a countervailing interest in detecting and deterring official misconduct. *See Rumery,* 480 U.S. at 394, 107 S.Ct. 1187.

### a. Objective Element

█ The *Cain/Livingstone II* objective element requires both that the facts

known to the prosecutor when the agreement was reached must have sufficed to support the prosecutor's proffered public interest reason for concluding the agreement, and that this public interest reason be a legitimate one. *Livingstone II,* 91 F.3d at 527; *Cain,* 7 F.3d at 381. Defendant argues that the public interest favors enforcing the agreement because such a result would obviate the government's burden of defending against a marginal claim, thereby conserving government resources. Defendant further argues that downgrading the charges against Plaintiff served the public interest. While Plaintiff's offenses, driving while intoxicated, refusing a Breathalyzer test, damaging a police vehicle, inter alia, are indeed serious, the Prosecutor was satisfied that the release-dismissal agreement penalized Plaintiff sufficiently, and the Court agrees.

■■■■ Defendant also argues that Plaintiff's civil rights action is marginal, which is a factor weighing in favor of enforcing the agreement and conserving government resources necessary for the litigation of the claim. Claims against law enforcement officials for use of excessive force are judged under the Fourth Amendment "reasonableness" standard, not under the "substantive due process" approach. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The reasonableness of the officer's conduct must be viewed from the "perspective of a reasonable officer on the scene, rather than with the ²⁰⁄₂₀ vision of hindsight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (citing *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). In determining whether the conduct was reasonable, courts should remember that officers make "split-second judgments" in sometimes tense and uncertain circumstances, such that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" will violate the Fourth Amendment. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.1973), *cert. denied,* 414 U.S. 1033,

94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). The standard is objective, and the inquiry must be whether the officer's conduct was "objectively reasonable" given the circumstances. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. It is important to note that the severity of the plaintiff's injury, while not determinative of whether excessive force was used, is certainly probative of the degree and amount of force applied. *See Byrd v. Clark,* 783 F.2d 1002, 1006 (11th Cir.1986).

Plaintiff argues that Defendant used excessive force on him while Plaintiff was in the back seat of a patrol car yelling and kicking the rear driver's side door and window. Plaintiff specifically alleged that in a series of three or four assaults, Defendant jumped on top of him and choked, strangled, pulled, and twisted him. Nevertheless, when Plaintiff was taken to the hospital that night, the Emergency Room medical records merely indicated an abrasion on Plaintiff's neck.

In light of all the circumstances surrounding the incident, the Court finds that Plaintiff's civil rights action is marginal. It is undisputed that Plaintiff was intoxicated and resisting arrest. Moreover, Plaintiff concedes that he was yelling and cursing and that he kicked out the police car window. Although certainly not conclusive, it is illuminating to note that Plaintiff's own attorney stated in the plea proposal that a "second opinion" from an "attorney who specializes in civil suits of this nature" also found such a suit to be of marginal merit. Because Plaintiff's claim is marginal, the Court finds that the prosecutor's decision to execute the agreement advanced the public interest in preserving governmental resources that would have been necessary to defend this action.

In *Cain* and *Livingstone II,* the Third Circuit indicated that

[a] prosecutor must conduct an 'individualized analysis' of a defendant's civil rights claims before concluding a release-dismissal agreement ... and that in order for a release-dismissal agreement to be enforceable, 'there must be a

case-specific showing that the released civil rights claims appeared to be marginal or frivolous at the time the agreement was made and that the prosecutor was in fact motivated by this reason.' 91 F.3d at 529, 7 F.3d at 383. In the present case, the Prosecutor, Roger J. Skoog, discussed the matter with the arresting officer and Plaintiff's counsel before concluding the agreement. (See Def. Ex. K at 4). Furthermore, at the time of the municipal court proceeding, the Prosecutor had reviewed the police reports concerning the incident. (*See* Verification of Roger J. Skoog, dated October 2, 1998, at ¶ 2). At that time, the Prosecutor was aware that Plaintiff had "resisted the police, exhibited characteristics of a person intoxicated," was yelling and cursing, and had kicked out the police car window. (Id.) The Prosecutor was also aware that the police officers restrained him as a result of such conduct. (*See Id.*). Moreover, the Prosecutor indicated that nothing in the records indicated that Plaintiff had suffered any serious injury, and the Prosecutor's visual impression of Plaintiff did not change his impression of Plaintiff's alleged injuries. (*See Id.* at ¶ 3). The Prosecutor further noted that the damage to the police car had been corroborated. (*See Id.* at ¶ 5). The Prosecutor's verification further provided as follows:

> These facts shown in the records led me to conclude that Davis' civil claims that may be brought in the future were marginal claims and not substantial, because the officers appeared to have acted reasonably given the resistance and not excessively.
>
> It was also my opinion that resolving the civil claim through a plea agreement and release would foster the public interest of conserving the government resources necessary for the litigation of the civil claims, especially if those claims are marginal.

(*See Id.* at ¶¶ 6, 7). The Prosecutor further stated that Plaintiff's penalties under the agreement punished him sufficiently for the charges against him and that the agreement was in the public interest. (*See*

*Id.* at ¶¶ 9, 10). The Court is satisfied that Prosecutor Skoog's verification accurately reflects his assessment of Plaintiff's civil action before the release-dismissal agreement was concluded, even though the verification was not executed until October 2, 1998.

#### b. *Subjective Element*

■ The "subjective element" requires that the public interest reason "proffered by" the prosecutor is "the prosecutor's actual reason for seeking the release." *Livingstone II*, 91 F.3d at 527 (citing *Cain*, 7 F.3d at 381). The purpose of the subjective element is to prevent a prosecutor from entering a release-dismissal agreement for an improper motive, e.g. protecting public officials from a meritorious civil rights suit, which a court may later excuse because the agreement achieves an incidental benefit. *Id.*

■ The Court is satisfied that the Prosecutor's public interest reasons proffered by the Prosecutor, as set forth above, were his actual reasons for seeking the release. The Court notes that Plaintiff has not alleged prosecutorial misconduct. Additionally, the Court notes that when the Warren County Prosecutor referred this matter to municipal court, on April 1, 1996, it dismissed the charge against Plaintiff for preventing a lawful arrest and downgraded the charge for preventing an official function. The Prosecutor's active involvement in this case at that time-over a year before Plaintiff filed this action on November 25, 1997—demonstrates good faith. The Court notes that the Prosecutor's decision to downgrade Plaintiff's charges was not part of a plea agreement. Moreover, the Prosecutor's action also resolves one of the central concerns expressed by the Supreme Court in *Rumery*, that prosecutors may bring frivolous charges to protect the interests of other officials.

On balance, the Court finds that the public interest favors the enforcement of this release-dismissal agreement. Because the Court hereby finds that the agreement is enforceable, Plaintiff released his right

to pursue the present civil rights action against Defendant and is fairly barred from proceeding any further in this case.

Finally, the Court finds that the Plaintiff, by agreeing to the agreement in open court with the secret intention of violating it, has played "fast and loose" with the courts. To permit this case to go forward would only diminish the public's confidence in our criminal justice system. Accordingly, no genuine issues of material fact exist, and the law is clear. Therefore, Defendant's motion for summary judgment will be granted, and Plaintiff's complaint will be dismissed.

### III. *CONCLUSION*

For the reasons stated herein, Defendant's motion for summary judgment is granted and Plaintiff's complaint will be dismissed. An appropriate order accompanies this Memorandum Opinion.