NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3099
_____

BASSEM KANDIL; SAMEH A. ABOELATA;
HALLA KANDIL, his wife; FLORA KANDIL, his wife

v.

GARY YURKOVIC, Police Officer; ANTHONY MARK ABODE, Police Officer;
WILLIAM OELS, III, Police Officer; WILLIAM OELS, JR.; EDWARD T.
BOBADILLA, Police Officer; CHIEF OF POLICE; CITY OF NEW BRUNSWICK;
NEW BRUNSWICK POLICE DEPARTMENT; MIDDLESEX COUNTY
PROSECUTORS OFFICE; MIDDLESEX COUNTY CORRECTIONAL FACILITY

BASSEM KANDIL; FLORA KANDIL, his wife,

                                        Appellants
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 06-cv-04701)
District Judge:  Honorable Dennis M. Cavanaugh
_____

Submitted Under Third Circuit LAR 34.1(a)
June 13, 2013

Before:  SCIRICA, HARDIMAN and ALDISERT, *Circuit Judges*.

(Filed: June 14, 2013)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

This case comes to us for the second time. At issue is whether a release-dismissal agreement signed by Appellant Bassem Kandil is enforceable. In 2011, we vacated a summary judgment against Kandil and remanded the matter for the District Court to decide whether Kandil's agreement was enforceable as a matter of public policy. *Kandil v. Yurkovic*, 448 F. App'x 228, 229 (3d Cir. 2011). After additional discovery, the District Court again granted summary judgment against Kandil. For the reasons that follow, we will affirm the District Court's judgment as to Kandil's federal claim, but will vacate as to his state law claims.

I

Because we write for the parties, who are well acquainted with the case, we recite only the facts and procedural history essential to its disposition. A more detailed statement of the facts and procedural history is available in our prior opinion. *See Kandil*, 448 F. App'x at 230–31.

In the early morning hours of October 1, 2004, Kandil was arrested for disorderly conduct. According to one of the arresting officers, Gary Yurkovic, Kandil instigated a belligerent confrontation with the police and then resisted arrest, which required the police to subdue him. Kandil was later indicted for aggravated assault, resisting arrest, and disarming a police officer. Although an internal police investigation accepted Yurkovic's version of events and cleared the arresting officers of wrongdoing, several

2

witnesses claimed that Kandil was arrested after he and his friends began talking to a woman named Pamela who was in a sexual relationship with Yurkovic, and that Yurkovic and the other officers beat up Kandil without provocation.

About a year later, Kandil and Middlesex County Assistant Prosecutor Marcia Silva reached an agreement whereby the criminal charges against Kandil would be suspended and later dismissed in exchange for a release of all his civil claims. Despite this agreement, Kandil sued under both 42 U.S.C. § 1983 and state law, arguing that his agreement was unenforceable as a matter of public policy. The District Court disagreed, and entered summary judgment against Kandil, holding that the release barred his claims.

## II[1]

We review the District Court's grant of summary judgment de novo, applying the same standard as the District Court.[2] *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 263 (3d Cir. 2006). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the District Court's opinion, we are not limited to its

---

[1] The District Court had jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). We have appellate jurisdiction under 28 U.S.C. § 1291.

[2] After the District Court granted summary judgment against him, Kandil moved for reconsideration, which was denied. Kandil's notice of appeal mentions only the denial of the motion for reconsideration. However, "an appeal from a denial of a Motion for Reconsideration brings up the underlying judgment for review." *McAlister v. Sentry Ins. Co.*, 958 F.2d 550, 552–53 (3d Cir. 1992).

proffered rationale, but rather "[w]e may affirm the District Court on any grounds supported by the record." *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000).

III

For a release-dismissal agreement to be enforceable under federal law, it must, among other things, be in the public interest. *See Town of Newtown v. Rumery*, 480 U.S. 386, 398 (1987); *Cain v. Darby Borough*, 7 F.3d 377, 381 (3d Cir. 1993) (en banc). More specifically, two requirements must be met. First, there must be an "objective" showing that the prosecutor proffered a legitimate public interest reason for entering into the agreement that was supported by the facts known to the prosecutor when the agreement was reached. Though labeled "objective," this inquiry does not require an independent evaluation of whether Kandil's claims are marginal or frivolous, as such an evaluation would entail the same costs and proceedings which release-dismissal agreements seek to avoid. Rather, our inquiry is limited to whether the prosecutors' conclusion regarding the claims was reasonable in light of the evidence. *See Livingstone v. N. Belle Vernon Borough*, 91 F.3d 515, 530 (3d Cir. 1996) (objective inquiry is whether "the facts known to [the prosecutor] *could have supported* the conclusion that the [plaintiffs'] civil rights claims were marginal or frivolous" (emphasis added)); *see also Cain*, 7 F.3d at 383 ("[T]here must first be a case-specific showing that the released civil rights claims *appeared to be* marginal or frivolous at the time the agreement was made." (emphasis added)). Second, there must be a "subjective" showing that the proffered reason was the

4

prosecutor's actual reason for entering into the agreement. *See Livingstone*, 91 F.3d at 527 (citing *Cain*, 7 F.3d at 381).

In this case, the prosecutors' proffered reason for entering into the release-dismissal agreement was that Kandil's civil claims appeared marginal or frivolous.[3] There is a legitimate public "interest in preventing the public fisc from being wasted by defending frivolous lawsuits." *Cain*, 7 F.3d at 381; *see also Rumery*, 480 U.S. at 395–96. Thus, the questions presented in this appeal are "whether [Kandil's] civil rights claims were regarded—and, if so, whether they were properly regarded—by the prosecuting attorney as marginal or frivolous." *Livingstone*, 91 F.3d at 530.

A

Kandil's release-dismissal agreement satisfies the objective prong of the public interest test because "the facts known to the prosecutor when the agreement was reached . . . sufficed to support the prosecutor's proffered public interest reason for concluding the agreement." *Id.* at 527.

Here, Kandil has presented some evidence that the police arrested him for an improper reason and used excessive force in doing so. Witnesses testified that Kandil was acting peacefully on the night in question, and did not consume any alcohol. On the other hand, there is significant countervailing evidence that Kandil was acting in an

---

[3] Defendants also suggested two other reasons the prosecutors might have entered into the release-dismissal agreement. We rejected both of those reasons in the previous appeal and will not revisit them here. *See Kandil*, 448 F. App'x at 234.

intoxicated and belligerent manner on the night in question and that the police did not use excessive force to subdue him.

First, the police department's internal investigation concluded that the officers acted reasonably and without excessive force. The investigation report noted that police reports filed at the time of the incident by Officers Yurkovic, William Oels, and Anthony Abode were consistent with their later interview testimony. The internal investigators also interviewed four employees of the hospital where Kandil was taken after his arrest. These employees unanimously described Kandil as "combative and aggressive." App. 1179. One nurse also described Kandil as "intoxicated."

Another contemporaneous police investigation casts further doubt on Kandil's version of events. Immediately after the incident, Kandil alleged that the police were motivated to arrest him for racial reasons. In response to this allegation, a police investigator interviewed Kandil at the hospital approximately eight hours after his arrest. In that interview, Kandil stated that he had consumed one gin and tonic that night, which conflicted with his witnesses' later statements that he had nothing to drink at all. In addition, the investigator "detected a very strong [odor] of alcohol emitting from [Kandil] as he spoke" and noted that Kandil "at times was [in very] close proximity to [the investigator] and at times . . . would even touch [the investigator's] left arm." App. 439.

Kandil's evidence itself bears internal indicia of unreliability. All but one of Kandil's witnesses were friends who were with him on the night in question. The one

6

independent witness was a woman named Lindsay, who was with Pamela that night and who was acquainted with Mohammed Farzaie, a member of Kandil's group. However, Lindsay's testimony presents only a weak case of police misconduct. Her testimony was presented in the form of a phone call with Farzaie, in which Farzaie repeatedly made leading statements and asked her leading questions. Lindsay admitted that she did not know Yurkovic's motivation for arresting Kandil, but only speculated that Yurkovic did so because "maybe [Pamela] told them that she felt threatened" or "maybe [Pamela] told them [Kandil's group was] harassing me." App. 674. In addition, Lindsay did not observe the actual scuffle between Yurkovic and Kandil, as she was "on the phone with [her] boyfriend" and "[g]etting in the car getting ready to go home" when it took place. App. 679.

In sum, when all the evidence is considered, it "could have supported the conclusion that [Kandil's] civil rights claims were marginal or frivolous." *Livingstone*, 91 F.3d at 530.

B

Having concluded that the prosecutors could have reasonably deemed Kandil's claims marginal, we must turn to whether they actually considered them as such. After our first remand, Prosecutor Silva was deposed. In her deposition, she stated that she considered the merits of Kandil's claim and discussed the issue of Pamela's relationship with Yurkovic with her boss. She also testified that Kandil's witness statements did not

7

influence her decision to enter into the agreement and that she "had no doubt reading the discovery, knowing that the case had been indicted by a Grand Jury, speaking to the officers and reviewing the discovery he provided, there was probable cause for arrest that night." App. 624.

Kandil has presented no evidence indicating that Silva testified falsely or that she was trying to hide evidence of police misconduct. In fact, Silva also testified that, "I walked into Judge DeVesa's on October 18th, I was trying that case, all the counts in the case." App. 629. Had she concluded that there was evidence of police misconduct to hide, she would have likely proposed the release-dismissal agreement earlier, rather than waiting for a settlement conference with a judge.

In addition, the criminal complaint against Kandil was filed two months before his notice of tort claim, and eleven months prior to the time he presented his evidence of police misconduct to the prosecutor. Insofar as the public interest requirement is intended to "curb the temptation to trump up charges in reaction to a defendant's civil rights claim," *Cain*, 7 F.3d at 380 (internal quotation marks omitted), that concern is not implicated here where the criminal charges were filed long before the prosecutors were aware of any civil claims. Therefore, we agree with the District Court that the subjective prong of the public interest test is satisfied and that Kandil's release-dismissal agreement is enforceable to bar his § 1983 claims against Defendants.

IV

Although we will affirm the District Court's judgment on Kandil's § 1983 claims, we will vacate the judgment insofar as it found Kandil's state law claims to be barred by his release-dismissal agreement.

Although the enforceability of release-dismissal agreements waiving § 1983 claims is a question of federal common law, the enforceability of such agreements releasing state law claims depends on state law. *Livingstone*, 91 F.3d at 539. Here, the District Court did not analyze under state law whether Kandil's state law claims were barred by his release-dismissal agreement. Therefore, we will vacate the District Court's disposition of the state law claims and remand. Of course, we leave to the District Court's discretion whether to decline supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3).

V

For the foregoing reasons, we will affirm the judgment of the District Court in part, vacate in part, and remand for further proceedings consistent with this opinion.